IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STEVEN ZIRKO, ) | |
| ) | |
| Plaintiff, ) | No. 16 C 10996 |
| ) | |
| v. ) | Judge John J. Tharp, Jr. |
| ) | |
| KAREN RABIDEAU, RANDY ) | |
| PFISTER, JOEL SHAW, LOUIS ) | |
| SAPIA, and XAVIER TAYLOR, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

In his second amended complaint, plaintiff Steven Zirko brings Section 1983 failure to protect claims against a variety of Stateville Correctional Center employees: Karen Rabideau, a placement officer; Randy Pfister, the former warden; Joel Shaw and Louis Sapia, former correctional officers; and Xavier Taylor, a former correctional lieutenant. For the reasons set forth below, the defendants' motion for summary judgment [56] is granted.

BACKGROUND

Plaintiff Steven Zirko has been in the custody of the Illinois Department of Corrections since 2009; he was convicted of first-degree murder and solicitation of murder and sentenced to two natural life sentences plus thirty years. Defs.' Statement of Facts ("SOMF") ¶¶1-2, ECF No. 38; *id.* Ex. A, Tr. 5:19-24. Zirko was assigned to Stateville Correctional Center in mid-2009 and remained there until he was transferred to Pontiac Correctional Center in September 2018. *Id.* Ex. A, Tr. 14:1-13. In the spring of 2015, Zirko was housed with Patrick Palaggi for the first time. *Id.* Ex. A, Tr. 19:12-16. Palaggi is also serving a natural life sentence pursuant to convictions for residential burglary, homicide, concealing a homicide, theft, and possession of a stolen motor

vehicle. SOMF ¶ 3; *id.* Ex. C, Tr. 39:10-40:1. The pair were housed in cell 2-40 for two to three months, and were subsequently moved together to cell 2-52. SOMF ¶ 4.

Zirko and Palaggi's relationship was contentious. Both men testified that they initially got along fine as cellmates. *See* SOMF Ex. A, Tr. 20:22-25; Ex. C, Tr. 16:3-8. But each acknowledges that the situation soured and, perhaps unsurprisingly, each attributes the deterioration of their relationship to the other. Palaggi described Zirko as generally irritating—he contends Zirko was "always trying to look over [his] shoulder to see what [he] was doing," "[t]rying to get behind [him] . . . to agitate [him]," and "[s]aying things in general conversation that were rude and abrasive." SOMF Ex. C, Tr. 16:15-22. Zirko, on the other hand, claims he and Palaggi had their first verbal altercation in November or December 2015. SOMF Ex. A, Tr. 21:1-6. Zirko was "something of a jailhouse attorney" and alleges Palaggi asked him to look over his criminal records; Zirko testified that "within maybe about two or three minutes of reviewing the file" he told Palaggi he could not help him, because Palaggi "raped and killed a little boy" and Zirko "[did not] want to have anything to do with [that] type of person." *Id.* Tr. 21:9-22:1. Zirko's refusal prompted Palaggi to threaten to "beat [him] to within an inch of [his] life" if Zirko ever said anything about Palaggi's criminal history. *Id.* Tr. 23:7-14. Zirko claims that Palaggi threatened to kill him "about ten times." *Id.* Tr. 46:25-47:2.

Zirko testified that he reported Palaggi's threats to Officer Shaw a month or two before January 10, 2016, and that Officer Shaw responded, "this will be the third time that I'll have to move you or move people around, deal with your own problems." *Id.* Tr. 47:13-48:18; *see also id.* Tr. 44:4-11 (Q: And why is Mr. Shaw a defendant in this case? **A: Because I went to him and I told him about the threats previous to the beating, about that Palaggi was threatening to kill me**."). He alleges he also complained about Palaggi more generally to Rabideau, a placement

2

officer, and other unidentified officers in Internal Affairs, including complaining that Palaggi is "a gangbanger, drug addict kind of guy"; that he and Palaggi "ha[d] nothing in common"; and that Palaggi was "unstable" because he was not taking psychotropic medication. *Id.* Tr. 41:5-42:19. Zirko stated he told Internal Affairs that he was in fear for his life because he (Zirko) "always says that." *Id.* Tr. 42:3-5.

On January 10, 2016, Zirko and Palaggi got into a physical altercation in their cell. SOMF ¶ 9. Their versions of the altercation differ. In his deposition, Zirko testified that he woke up on January 10 around 6:45 a.m. to Palaggi striking him repeatedly across the face (and specifically across his right eye) with a hard object or with his fists, and that Zirko retaliated by punching Palaggi once in the mouth before Officer Grimes came by on his 7:00 a.m. rounds, saw Zirko's injuries, and took him to Internal Affairs. SOMF Ex. A, Tr. 25:2-26:3. Palaggi, on the other hand, claims that Zirko instigated the fight by verbally accosting him for whistling in the cell and attempting to kick Palaggi in his abdomen, where Zirko knew Palaggi had an incision and soreness from an upper abdominal hernia surgery performed a month and a half earlier. SOMF ¶ 5; *id.* Ex. C, Tr. 21:22-24:10. Both men were issued disciplinary reports for fighting, and both were found guilty of the infraction. They each received thirty days in segregation, a downgrade in their security level, and denial of commissary privileges. SOMF ¶ 10. Palaggi testified that he had previously received a ticket for fighting in Cook County Jail in approximately 1988 but could not recall receiving any others. SOMF Ex. C, Tr. 35:7-14.

About two and a half weeks after the fight, Zirko lost vision in his right eye. SOMF ¶ 11. He was seen by an outside physician on February 29, 2016, and he underwent surgery on March 15, 2016, to repair the diagnosed complete retinal detachment. Pl.'s Statement of Add'l Facts ("PSAF") ¶¶ 20-21. Several months later, Zirko required a second surgery to correct the cataract

3

that had developed in his right eye. PSAF ¶ 23. Cataract surgery restored his vision, but he remains photosensitive in his right eye due to the retinal detachment. PSAF ¶ 24.

In his second amended complaint, Zirko brings Section 1983 failure to protect claims against Karen Rabideau, Randy Pfister, Joel Shaw, Louis Sapia, and Xavier Taylor in their individual capacities. *See* Second Am. Compl. 4-8, ECF No. 38. He seeks compensatory and punitive damages. *Id.* The defendants have moved for summary judgment of Zirko's claims. Defs.' Mot. Summ. J., ECF No. 56.

## DISCUSSION

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the record and the inferences drawn from it in the light most favorable to the non-moving party. *Courtney v. Biosound, Inc.*, 42 F.3d 414 (7th Cir. 1994). The court's role is "not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the ultimate truth of the matter"; rather, the court's responsibility is to determine "whether there exists a genuine issue of triable fact." *Guzman v. Sheahan*, 495 F.3d 852, 856 (7th Cir. 2007), *citing Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986). If the evidence is such that a reasonable jury could return a verdict for the nonmoving party, there is a dispute of material fact and summary judgment is inappropriate. *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017).

    a.   <u>Section 1983 Claims against Rabideau, Pfister, Sapia, and Taylor</u>

Zirko concedes that "based upon his testimony at his deposition, summary judgment should be granted in favor of defendants Rabideau, Pfister, Sapia, and Taylor." Pl.'s Resp. Opp'n Summ. J. 2, ECF No. 64. Accordingly, the motion for summary judgment is granted as to those defendants.

4

      b. <u>Section 1983 Claims against Shaw</u>

Zirko opposes summary judgment as to Officer Shaw, however, arguing that there is a genuine issue of material fact as to whether Officer Shaw "knew that Steven Zirko faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it." Pl.'s Resp. Opp'n Summ. J. 5. Prison officials have a duty to protect prisoners from violence at the hands of other prisoners—as the Supreme Court has observed, "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotations and citation omitted). But for his suffered injury to "translate[] into constitutional liability for prison officials responsible for [his] safety," *id.* at 834, Zirko must establish that Officer Shaw was "deliberately indifferent to an excessive risk to [his] health or safety." *LaBrec v. Walker*, 948 F.3d 836, 841 (7th Cir. 2020). The deliberate indifference standard "includes both an objective and subjective component": Zirko must establish, first, that he was exposed to objectively serious harm, and second, that Officer Shaw had actual knowledge of the risk but failed to take reasonable steps to address it. *Id.*

An inmate "normally proves actual knowledge of impeding harm by showing that he complained to prison officials about a specific threat to his safety." *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996). If, however, a complaint conveys "only a generalized, vague, or stale concern about one's safety" or "is contradicted by the prisoner himself," *Gevas v. McLaughlin*, 798 F.3d 475, 480-81 (7th Cir. 2015), or an inmate's complaint does not apprise prison officials of "surrounding circumstances that could render plausible [the inmate's] claim of a threat to his safety," the complaint is "insufficient to allow an inference that a substantial risk of harm existed and that [prison officials] in fact recognized that risk." *Compare LaBrec*, 948 F.3d at 846 (grant

5

of summary judgment proper as to two prison officials who were aware that the plaintiff claimed he felt unsafe with his cellmate, was designated a pair-with-care, visited with Psychological Services, and had an anxiety attack, because they were "unaware of some other surrounding circumstances" that rendered the plaintiff's claim of a threat plausible), *with id.* at 846-47 (summary judgment inappropriate as to other prison officials who had more credibility-bolstering context for the plaintiff's complaints).

Analyzed through this lens, the parties' continued factual disagreement as to whether Zirko actually informed Officer Shaw about Palaggi's threats is immaterial and does not prevent summary judgment. At most, Zirko's deposition testimony establishes that he told Officer Shaw on a single occasion, one or two months before the altercation, that Palaggi had threatened to beat him "into an inch of [his] life." SOMF Ex. A, Tr. 47:13-48:18. Standing alone, this single complaint lacked any context that would render the threat plausible or imminent and create an obligation for Officer Shaw to address it. *Compare LaBrec*, 948 F.3d at 846-47; *Gevas*, 798 F.3d at 481 (plaintiff's multiple complaints that cellmate threatened to stab him because the cellmate believed he had "snitched" on a prior cellmate related a "specific, repeated, imminent, and plausible threat to his safety").

That Zirko separately told Rabideau and other unidentified internal affairs officers that he and Palaggi did not get along and complained about Palaggi's "unstable" "aggressive and violent" behavior cannot support a jury inference of actual knowledge, because nothing in the record indicates Officer Shaw was aware of those complaints. PSAF ¶¶ 7-10; SOMF Ex. A, Tr. 41:5-42:19, Tr. 44:7-11, Tr. 46:25-48:18. Nor did Zirko make Officer Shaw, or anybody else at Stateville, aware of the alleged motivation for Palaggi's threats, which might have bolstered the

6

credibility of his claims.[1] Here, the only additional context Officer Shaw had to evaluate Zirko's report was that Zirko had made similar complaints about two other cellmates ("this will be the third time I'll have to move you"). *See* SOMF Ex. A, Tr. 40:7-41:3 (Zirko had gone to Internal Affairs twice—one of those times through an attorney—to complain about "problems" with past cellmates, and Officer Shaw was involved in his reassignment both times). That Zirko had cried "wolf" several times before certainly gave Officer Shaw no reason to believe that Zirko was at imminent risk.[2]

Even when viewed in the light most favorable to Zirko, the evidence in the record is "insufficient to allow an inference that a substantial risk of serious harm existed and that [Officer Shaw] in fact recognized that risk." *LaBrec*, 948 F.3d at 846. Summary judgment is therefore appropriate as to Zirko's remaining Section 1983 failure to protect claim against Officer Shaw.

\*    \*    \*

---

[1] The defendants also contend that Palaggi's convictions do not include sexual violence toward or the murder of a child, and that Palaggi was not prescribed psychotropic medication during 2015. SOMF ¶¶ 3,7. Both facts, if true, undermine the credibility of Zirko's claims about Palaggi's motivation for threatening him and about Palaggi's displayed aggressive behavior prior to the altercation; if Officer Shaw was aware of this information, such inconsistencies would bear on the reasonableness of his alleged response to Zirko's complaint. *See, e.g.*, *Gevas*, 798 F.3d at 482 (noting that prison officials are "not required to believe that [an inmate] [i]s in danger" and that "[f]or any number of reasons, including information acquired in the course of any investigation" into an inmate's complaint, a prison official may conclude that the inmate is not credible or that a cellmate does not present a genuine threat to his safety). But because both issues are at least facially disputed, *see* Pl.'s Reply SOMF ¶¶ 7, 9, and, more importantly, because nothing in the record establishes that Officer Shaw was familiar with these facts at the time Zirko made his complaint, they are not considered in the Court's analysis.

[2] Zirko testified that he told Officer Shaw that Palaggi had threatened to beat him "a month or two" prior to the incident. SOMF Ex. A, Tr. 48:15-18. Zirko was not attacked or injured at that time, however, and by the time of the fight, Zirko's report to Shaw was stale. Even if Zirko's initial complaint had been more credible at the time it was made, the subsequent passage of one or two months in which Palaggi did not attack Zirko as allegedly threatened gave Officer Shaw reason conclude that Palaggi did not present any substantial, imminent danger to Zirko.

7

For the foregoing reasons, the defendants' motion for summary judgment [56] is granted. Final judgment will be entered in the defendants' favor, and the case will be terminated.

Dated: February 1, 2021

John J. Tharp, Jr.
United States District Judge